UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2020 MAR -9 AM 11:37

FILED

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VENUS DOOKWAH-ROBERTS, PH.D., | ) | Civil Action No. 8:2020cv541 T36AEP |
| Plaintiff, | ) | |
| v. | ) | **FILED UNDER SEAL** **JURY TRIAL DEMAND** |
| PHYSICIAN PARTNERS OF AMERICA, LLC, FLORIDA PAIN RELIEF GROUP, PLLC, TEXAS PAIN RELIEF GROUP, PLLC, and MEDICAL TOX LABS, LLC., | ) | **DO NOT PLACE IN RUN BOX** **DO NOT PLACE ON PACER** |
| Defendants. | ) | |

**PLAINTIFF-RELATOR'S QUI TAM COMPLAINT**

Plaintiff-Relator Venus Dookwah-Roberts, Ph.D., brings this *qui tam* action, pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"), in the name of and on behalf of the United States of America ("Plaintiff"), by and through her counsel of record, and states as follows:

## INTRODUCTION

This is an action by *qui tam* relator, Venus Dookwah-Roberts, Ph.D. ("Relator"), to recover penalties and damages arising from violations of the FCA committed by Defendants: Physician Partners of America, LLC ("PPOA"), Florida Pain Relief Group, PLLC ("FPRG"), Texas Pain Relief Group, PLLC ("TPRG"), and Medical Tox Labs, LLC ("MTL") (collectively "Defendants").

TPA-60336 $400

Relator claims that Defendants knowingly performed or caused to be performed urine drug tests ("UDTs") on Medicare patients that were not medically necessary and/or validly ordered by the treating physician in violation of federal law. Relator further alleges that Defendants knowingly presented false and fraudulent claims to the Government in order to be reimbursed for these unlawful tests in violation of the FCA. If the Government had known the true nature of the Defendants' claims, it would not have reimbursed Defendants for these tests. Relator also alleges Defendants knowingly failed to report and return amounts improperly billed through July 2018 after Defendants became aware of their improper UDT billing practices dating back approximately three years.

Relator further alleges that Defendants' businesses are structured and operated to directly funnel into Defendants' labs the maximum number of UDTs for processing without regard for medical necessity. Relator also alleges that the lab staff conducting the UDT analysis are not directly supervised by the patients' treating physicians, and in most cases the lab is not at the same location as the supervising physician ordering the UDTs. Relator alleges MTL incurs unreimbursed expenses for lab services and supplies provided to FPRG and TPRG in order to influence and encourage the physicians with FPRG and TPRG to direct lab testing to MTL. Relator alleges that Defendants conduct violates the Anti-Kickback Statute and the Stark Law.

## PARTIES

1. Relator is a resident of Sarasota, Florida and has lived in the State of Florida since 2011.

2. Relator was employed by Defendant PPOA as the manager of PPOA's physician owned lab ("POL") and MTL's lab in Tampa, Florida from January 15, 2018, to November 1, 2019. Relator has a Ph.D. in Chemistry. Relator has personal knowledge that Defendants routinely performed UDTs on Medicare patients that were not medically necessary and were not

validly ordered by the treating physician in violation of federal regulations and laws. Relator also has personal knowledge regarding how the Defendants' businesses are structured and operated with regard to lab management, physician supervision of the lab staff, the provision of improper recommendation from the labs, and the physical locations of the labs. The UDTs performed on Medicare patients resulted in false and fraudulent claims for healthcare services presented, or caused to be presented, by Defendants. Relator has personal knowledge of the performance of medically unnecessary tests and/or tests unsupported by a legitimate order from the treating physician on Medicare and other patients, and personal knowledge of the structure and operation of Defendants' businesses with regard to lab management, physician supervision of the lab staff, the provision of improper recommendation from the labs, and the physical locations of labs. Therefore, Relator constitutes an original source, as defined in 31 U.S.C. § 3730(e)(4)(B), of the claims described herein.

3. PPOA is a limited liability company registered in the State of Delaware with a principal business office at 550 North Reo Street, Suite 100, Tampa, Florida 33609. PPOA's manager is David A. Wood, and its registered agent for service of process is attorney David L. Koche, 601 Bayshore Boulevard, Suite 700, Tampa, Florida 33606. Upon information and belief, PPOA owns, controls, and/or operates multiple pain management medical clinics, and until November 1, 2019, PPOA employed Relator to manage the POLs owned by FPRG and MTL at the 3450 E. Fletcher Street, Tampa, Florida 33613 ("Fletcher Avenue" location).

4. FPRG is a professional limited liability company registered in the State of Florida with a principal business office at 550 North Reo Street, Suite 100, Tampa, Florida 33609. FPRG's manager is Dr. Rodolfo Gari, and its registered agent for service of process is attorney David L. Koche, 601 Bayshore Boulevard, Suite 700, Tampa, Florida 33606. FPRG owns,

controls, and/or operates multiple pain management clinics in Florida, and FPRG owns, controls, and/or operates a POL at FPRG's Fletcher Avenue location. Part of the UDTs obtained from patients at each FPRG location are processed at the FPRG Fletcher Avenue location.

5. TPRG is a professional limited liability company registered in the State of Texas with a principal business office at 550 North Reo Street, Suite 100, Tampa, Florida 33609. TPRG's manager is Dr. Rodolfo Gari, and its registered agent for service of process is attorney David L. Koche, 601 Bayshore Boulevard, Suite 700, Tampa, Florida 33606. TPRG owns, controls, and/or operates multiple pain management clinics in Texas, and TPRG owns, controls, and/or operates a POL at 2730 Virginia Parkway, McKinney, Texas 75071 ("Virginia Parkway" location). Part of the UDTs obtained from patients at each TPRG location are processed at the TPRG Virginia Parkway location.

6. MTL is a limited liability company registered in the State of Florida with a principal business office at 3450 Fletcher Avenue, Tampa, Florida 33613. MTL's manager is David A. Wood, and its registered agent for service of process is attorney David L. Koche, 601 Bayshore Boulevard, Suite 700, Tampa, Florida 33606. Upon information and belief, MTL owns, controls, and/or operates a diagnostic lab that processes part of the UDTs on samples obtained from patients at all FPRG and TPRG locations.

7. PPOA is the parent company that owns and operates FPRG and TPRG. PPOA also owns several ambulatory surgical centers, pharmacies, and laboratories. Dr. Rodolfo Gari formed PPOA in 2013 and describes himself on the PPOA website as a "physician turned entrepreneur." Dr. Gari works with David A. Wood, who serves as the "Chief Experience Officer" of PPOA. According to its website, MTL is an affiliate of PPOA, and David A. Wood also manages MTL. The business operations of PPOA, FPRG, TPRG, and MTL are run from the

same location on North Reo Street in Tampa, Florida. PPOA manages the daily business operations including billing and human resources for FPRG, TPRG, and MTL. The PLLC or LLC formation documents for each of these entities were filed and registered by attorney David L. Koche with Barnett, Bolt, Kirkwood, Long, Koche, and Foster, a business and tax law firm in Tampa, Florida.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as well as 28 U.S.C. § 1345 (as the United States is a Plaintiff) and 31 U.S.C. §§ 3730(b) and 3732(a) (the FCA).

9. The Court may exercise personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process in cases brought under the FCA in a judicial district in which any one defendant can be found, resides, or transacts business, or in which any act proscribed by the FCA occurred. Defendants purposefully conduct business in this judicial district and, as alleged herein, various acts proscribed by the FCA occurred in this judicial district; thus, personal jurisdiction over all Defendants lies with this Court.

10. Venue is appropriate within the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because a substantial part of the events and illegal acts and practices giving rise to the claims alleged in this Complaint occurred in this judicial district, because Defendants purposefully conduct business in this judicial district, and because, as alleged herein, various acts proscribed by the FCA occurred in this judicial district.

11. Relator has made the appropriate and confidential voluntary disclosures to the United States Government prior to the filing of this lawsuit on behalf of Plaintiff as required by 31 U.S.C. § 3730(b)(2).

## SUMMARY OF APPLICABLE LAW

### A. The False Claims Act

12. Congress enacted the False Claims Act which provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), . . . or (G); [or]
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than [$5,500 and not more than $22,363],[1] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

13. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information "(i) has actual knowledge of the information; (ii) acts in

[1] Pursuant to 31 U.S.C. § 3729(a)(1), for each violation of the FCA, Plaintiff is entitled to recover a civil penalty "of not less than $5,000 and not more than $10,000, *as adjusted* by the Federal Civil Penalties Inflation Adjustment Act of 1990 (the "Inflation Act') . . ." (emphasis added). Per the relevant adjustments by the Inflation Act, Plaintiff is entitled to recover a civil penalty of $5,500 to $11,000 for each violation occurring from September 29, 1999, to November 2, 2015, and $11,181 to $22,363 for each violation occurring after November 2, 2015. *See* 28 C.F.R. § 85.3(a)(9) and 28 C.F.R. § 85.5, respectively. Thus, depending on the date upon which each individual violation occurred, Plaintiff is entitled to recover civil penalties ranging from $5,500 to $22,363 for each violation.

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**B. Stark Law**

14. The Stark Law was enacted to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest. The Stark Law prohibits physicians from referring Medicare patients to an entity for certain "designated health services" if the referring physician has a nonexempt "financial relationship" with such entity. 42 U.S.C. § 1395nn(a). Clinical laboratory services like UDTs are "designated health services." 42 U.S.C. § 1395nn(h)(6)(A). A physician has a "financial relationship" with an entity if the physician has "an ownership or investment interest in an entity" or a "compensation arrangement" with the entity. 42 U.S.C. § 1395nn(a)(2).

15. The Stark Law allows physicians to refer Medicare patients to laboratories with which they have a financial relationship only if the arrangement strictly complies with a Stark Law exception such as a the in-office ancillary services ("IOAS") exception. 42 C.F.R. § 411.355. To meet the IOAS exception (a) ancillary services are provided by the referring physician, a member of the referring physician's group practice, or an individual supervised by the referring physician, (b) the designated health service is furnished in the same or centralized building as the professional service, and (c) the designated health services is billed by the performing or supervising physician, the group practice, an entity wholly owned by the group or the performing or supervising physician, or an independent third party pursuant to reassignment requirements. *Id.*

### C. The Anti-Kickback Statute

16. The Anti-Kickback Statute ("AKS") arose out of Congressional concern that providing things of value to those who can influence healthcare decisions may corrupt the professional judgment of healthcare providers and result in federal funds being diverted to pay for goods and services that are medically unnecessary, among other things.

17. The AKS prohibits any person or entity from soliciting, receiving, offering, or paying any remuneration to induce a person to, or to reward a person for, referring, recommending, or arranging for the purchase of any item for which payment may be made in whole or in part by a federal healthcare program. In pertinent part the statute provides:

> b. Illegal remunerations
>
> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind.
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in party under a Federal health care program, or
>
> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony

> and upon conviction thereof, shall be fined not more than $25,000 or imprisoned not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

18. The AKS not only prohibits outright bribes to a physician, but also prohibits offering or paying any remuneration to a physician that has, as one purpose, inducement of the physician's referrals to a federal health care program.

19. The Office of the Inspector General for the United States Department of Health and Human Services ("HHS-OIG") has published safe harbor regulations that define arrangements that are not subject to the AKS because such practices would be unlikely to result in fraud or abuse. Safe harbor protection is afforded only to those arrangements that meet all of the conditions set forth in the safe harbor.

20. HHS-OIG issued "Special Fraud Alert: Laboratory Payments to Referring Physicians" dated June 25, 2014. *Reprinted* at 79 Fed. Reg. 40,115. In the Alert, HHS-OIG warned that when a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, an inference exists that the thing of value is offered to induce the referral of business. Free or below market goods or services to the potential referral source are suspect and violate the AKS. *Id.* Further, HHS-OIG emphasized that both sides of a kickback transaction (the person or entity making as well as receiving the prohibited referral) are liable under the AKS. *Id.*

**D. The Medicare Program**

21. In 1965, Congress enacted Title XVIII of the Social Security Act, commonly known as the Medicare Program, to pay for the costs of certain healthcare services. The Medicare Program is a federal health insurance program for older Americans and persons with disabilities. Individuals who are insured by Medicare are known as beneficiaries. Medicare is

funded by the federal government and administered by the Centers for Medicare & Medicaid Services ("CMS").

22. The Medicare Program is comprised of several parts. Healthcare services and payment under Part B of the Medicare Program are the subjects of this case. Part B of Medicare is a federally subsidized, voluntary insurance program that covers a percentage (typically 80%) of the fee schedule amount for various medical and other health services provided to Medicare patients by physicians, laboratories, and other facilities. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s); *see also* 42 C.F.R. § 410.152(b).

23. Medicare reimburses health care providers for the reasonable costs of covered health services for Medicare beneficiaries. *See* 42 U.S.C. §§ 1395f(b)(1), 1395x(v)(1)(A). Healthcare providers rendering services to Medicare beneficiaries seek reimbursement by submitting a claim form to their assigned Medicare Administrative Contractor ("MAC").

24. MACs are assigned by provider state. Defendants' assigned MAC during the relevant time periods in Florida is First Coast Service Options, Inc. ("FCSO"), which handles all Medicare Part A and B claims in the State of Florida. Defendants' assigned MAC during the relevant time periods in Texas is Novitas Solutions, Inc. ("Novitas"), which handles all Medicare Part A and B claims in the State of Texas.

25. For reimbursement from Medicare, providers submit a claim form called a CMS Form 1500 (formerly known as a HCFA 1500), a "Request for Medicare Payment" which identifies, among other things, the services provided to the patient, the symptoms or diseases suffered by the patient, and the medical professional providing the services. The provider certifies, expressly and impliedly when submitting the CMS 1500 requesting payment, that the information provided is truthful. Specifically, the provider certifies via his or her signature that

"the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction." CMS 1500, Health Insurance Claim Form p. 2. Also, the provider "certifies that the foregoing information is true, accurate, and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents or concealment of materials fact, may be prosecuted under applicable Federal or State laws." *Id.* The provider certifies that "[i]n submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each services rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is report in the designated section." *Id.*

26. At all times relevant to this action, FCSO and/or Novitas reviewed and approved the claims at issue in this case based upon the claim information provided by Defendants and

relied on the truth of the information in determining whether to pay the claims submitted by Defendants.

27. When submitting claims to government healthcare programs, healthcare organizations and professionals are identified by a provider number. No healthcare provider may submit claims and receive payment from the Government for services provided to Medicare beneficiaries unless the provider has first applied for and received a Medicare provider number. Once approved, the provider number designated by Medicare is unique to that Medicare provider. All claims submitted by the Medicare provider must utilize the specific provider number, and all Medicare payments for reimbursement must be identified by the specific provider number.

28. CMS regulates all non-research, laboratory testing on humans in the United States through the Clinical Laboratory Improvement Amendments ("CLIA"). All clinical laboratories must have a valid CLIA Certificate Identification Number to receive Medicare/Medicaid payments. There are multiple types of CLIA certifications based on the complexity of testing each lab conducts. *See* 42 U.S.C. § 263(a); 42 C.F.R. § 493. The FPRG and TPRG POLs and MTL have separate CLIA numbers that are utilized when billing for lab services.

29. The American Medical Association developed and periodically updates a set of Current Procedural Terminology ("CPT") codes, which are used by physicians and other providers to identify and report the medical procedures they perform. The purpose of CPT codes is to provide a uniform language that accurately describes medical, surgical, and diagnostic services for reliable, standardized communication between physicians, government programs, and private health insurance plans throughout the United States.

30. When billing for services provided to Medicare patients, providers also use Healthcare Common Procedure Coding System codes ("HCPCS codes"), which are based on the AMA's current CPT codes. Each common medical procedure or service, including diagnostic tests, is identified by a five (5) digit HCPCS code, which uniquely describes that particular service, procedure, or test. Providers use HCPCS codes to report which service they actually performed when seeking reimbursement from Medicare. The codes are billed on the CMS Form 1500 to Medicare, as they were in this case.

**E. Medicare Coverage for Laboratory Tests**

31. Medicare Part B only covers services, including diagnostic laboratory services, that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

32. Medicare rules require that all diagnostic tests or procedures payable under the Physician Fee Schedule be ordered by the physician who is treating the beneficiary, *i.e.*, "the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary" and are therefore not covered or payable by Medicare. *Id.*; 42 U.S.C. § 1395y ("[N]o payment may be made under [Medicare Part A or B] for any expenses incurred for items or services which . . . are not reasonable and necessary.").

33. A "physician" includes "a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such function or action." 42 U.S.C. § 1395x(r)(1).[2]

34. Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests must be ordered by the physician "who is treating the beneficiary… for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary or payable by federal healthcare programs. 42 C.F.R. § 410.32(a).

35. The physician must clearly document in the medical record his or her intent that the test be performed. *See* Medicare Benefit Policy Manual ("MBPM"), Ch. 15, § 80.6.1. The physician's order may "conditionally request an additional diagnostic test for a particular beneficiary if the result of the initial diagnostic test ordered yields to a certain value determined by the treating physician/practitioner (e.g., if test X is negative, then perform test Y)." *Id.* Each diagnostic test ordered by a treating physician must be reasonable and necessary. *Id.*

36. Medicare requires proper and complete documentation of the services rendered to beneficiaries. 42 U.S.C. § 1395l(e). Medicare regulations state that a laboratory's claim for services will be denied if there is not sufficient documentation in the patient's medical records to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3).

37. As a condition of Medicare payment, a physician or other Medicare-qualified clinical personnel (such as physician assistants and nurse practitioners) must certify that the testing performed is medically necessary and reasonable for the diagnosis and treatment of the

---

[2] Under Medicare regulations, dentists, podiatrists, optometrists, and chiropractors are also considered "physicians" under certain circumstances not at issue here. *See* 42 U.S.C. § 1395x(r)(2)-(5).

patient. 42 U.S.C. § 1395n(a)(2)(B); 42 C.F.R. § 424.10(a). This certification is made on the CMS 1500 form, *supra* ¶ 25.

**F. Urine Drug Testing**

38. Many of the patients treated by the Defendants receive chronic opioid therapy ("COT") to treat their chronic pain. The physicians writing these COT prescriptions order UDTs to monitor their patients for adherence/compliance, abuse, misuse, efficacy, patient safety, side effects, and drug interactions.

39. Typically, providers utilize UDTs to verify whether pain patients are compliant with taking their prescription drugs and to confirm that the patient is not taking other drugs, including illicit drugs, which could interfere with their treatment or pose risks of overdose. For this reason, providers often perform drug tests, including UDTs, on pain patients at appropriate intervals when medically necessary to manage patient care. When UDTs are medically necessary, the government provides reimbursement for such tests.

40. Common practice in the medical community is to first order a qualitative test of urine to detect the presence or absence of drugs or metabolites (or "analytes") in the sample. Qualitative tests may also be referred to as "presumptive" tests or "screening" tests. A typical qualitative drug test panel may include testing for the presence of cocaine, opiates, opioids, heroin, amphetamines, methamphetamines, benzodiazepines, phencyclidine (PCP), MDMA, barbiturates, methadone, tricyclic antidepressants, synthetic or designer drugs, oxycodone, and THC. Qualitative testing does not measure the concentration of drugs in the sample. Although it is the less expensive UDT test that only gives a positive or negative result, each qualitative UDT must be individually ordered by the treating physician to be medically necessary. A treating physician or the physician's medical practice cannot issue blanket orders for all patients to

receive a qualitative UDT. Each qualitative UDT must be supported by an individualized determination by the treating physician of medical necessity.

41. Depending on the initial results from the qualitative testing, it may be medically appropriate to next perform a quantitative drug test to determine the concentration or amounts of specific drugs in a patient's system. Quantitative tests may also be referred to as "definitive" tests or "confirmation" tests. The purpose of quantitative testing is to confirm any positive results from the qualitative testing and to determine the concentration of the specific drug(s) present. Unlike qualitative tests, which can test for all drugs in one sample at once, quantitative tests require separate testing for each drug. Because each drug is tested separately, the testing equipment needed for quantitative tests is much more sophisticated than what is needed at the qualitative level. Thus, quantitative testing is more expensive to perform and is reimbursed at a higher rate than qualitative testing.

42. Medicare rules limit quantitative tests to clinical situations where qualitative testing has been performed and the results indicate that quantitative testing for particular drugs is needed. In addition, the frequency of quantitative testing also must be individualized to patient need in order to be reasonable and medically necessary. Ongoing testing in COT patients can be acceptable, as can randomized testing, but only under specific conditions particular to the individual patient. A treating physician or the physician's medical practice cannot issue blanket orders for all patients to receive a quantitative UDT. Each quantitative UDT must be supported by an individualized determination by the treating physician of medical necessity.

43. Medicare requires that providers make decisions regarding the need for and number of drugs tested quantitatively on a case-by-case basis. Most patients will not test positive

for any drugs on a qualitative test (save those being prescribed to them) or, if there are positive results, the results are typically limited to a few drugs.

44. Most patients do not warrant quantitative UDTs. Even in those cases where quantitative testing is appropriate, it is rarely medically necessary to perform quantitative testing for each drug a qualitative test can detect.

45. On or about October 11, 2015, FSCO issued LCD L36393 and Novitas issued LCD L35006 both entitled "Controlled Substance Monitoring and Drugs of Abuse Testing." The LCD's address various types of patients according to the covered indications for UDTs. Specifically, the LCD, address "chronic pain management drug testing for patients on chronic opioid therapy." The LCD's provide that, "[a] physician who is writing prescriptions for medication to treat chronic pain may need to know if the patient is taking substances which can interact with prescribed medications or taking prescribed medications as expected. Additionally, the physician must monitor for adherence/compliance, efficacy, patient safety, side effects, and drug interaction . . . . Criteria to establish medical necessity for drug testing must be based on patient-specific elements during the clinical assessment, and documentation by the clinician in the patient's medical record . . . ." The LCD's provide guidance for baseline and monitoring testing according to a patient's risk level, but the LCD's require that all testing be based on the clinician's documented assessment of medical necessity. The LCD's specifically prohibit blanket orders, which are defined as "a test request that is not for a specific patient; rather, it is an identical order for all patient's in a clinician's practice without individualized decision making at every visit."

46. Medicare rules regarding orders for diagnostic tests provide that physicians may "conditionally request an additional diagnostic test for a particular beneficiary **if** the result of the

initial diagnostic test ordered yields to a certain value determined by the treating physician/practitioner (e.g., if test X is negative, then perform test Y)." MBPM, Ch. 15, § 80.6.1 (emphasis added). The treating physician must specifically order additional diagnostic testing based on an individual decision that the initial diagnostic test result requires additional testing. *Id.* at 8.6.2.

47. On September 12, 2016, CMS issued a Medicare Learning Network statement regarding "Provider Compliance Tips for Laboratory Tests – Other – Urine Drug Screening." CMS stated that, to prevent denials, "[a]ll . . . diagnostic laboratory tests . . . must be ordered for the treatment of the individual patient. Criteria to establish medical necessity for drug testing must be based on patient-specific elements identified during the clinical assessment and documentation by the clinician in the patient's medical record. Tests used for routine screening of patients without regard to their individual need are not usually covered by the Medicare Program, and therefore not reimbursed."

48. During the relevant time periods in this matter, the pertinent CMS HCPCS codes for qualitative/presumptive testing are: 80305 (presumptive/direct optical observation), 80306 (presumptive/instrument assisted observation), and 80307 (presumptive/instrument chemical analyzer). The pertinent codes for quantitative/definitive testing are: G0480 (definitive/testing 1-7 drug classes), G0481 (definitive/testing 8-14 drug classes), G0482 (definitive/testing 15-21 drug classes), and G0483 (definitive/testing +22 drug classes). In 2019, the fee schedule for each code is as follows:

| | |
|---|---|
| 80305 | $12.60 |
| 80306 | $17.14 |
| 80307 | $64.65 |
| G0480 | $114.43 |
| G0481 | $156.59 |
| G0482 | $198.74 |

| | |
|---|---|
| G0483 | $246.92 |

**FACTUAL ALLEGATIONS**

49. In January 2018, when Relator started working for PPOA, the treating physicians with FPRG and TPRG had a standard process when ordering UDTs for patients. Following the treating physician's consult with the patient, the physician directed the Medical Assistant ("MA") that UDTs were needed and handed off the patient to the MA. The MA provided the patient with the sample collection cup and directed the patient to the bathroom. The MA prepared and obtained a standard UDT requisition form from the computer system that is managed by PPOA for the clinics. The requisition form, however, was printed with the physician's electronic signature for the order of UDTs, patient insurance information, and information regarding the prescribed drugs that should be reflected in the sample. The requisition form did not allow the MA or the treating physician to select or specify the type or level of UDTs (*i.e.*, qualitative and/or quantitative) to be conducted by the lab. Rather, the standard requisition form from the PPOA computer system directed the lab to process both the "UDS" (the qualitative/presumptive test) and the "390 Drug Confirmation" (the quantitative/definitive test). The MA directed the patient to sign the requisition form, labelled the sample cup, and placed the sample and form in the specimen bag to go to the POL lab.

50. In January 2018, when Relator started working for PPOA, the FPRG POL and MTL had processing procedures for the UDTs received from FPRG clinics. Urine samples for all the FPRG pain management clinics throughout Florida were mailed via overnight delivery to the Fletcher Avenue location in Tampa. The FPRG POL located at Suite 350 of the Fletcher Avenue location received the urine samples in specimen bags along with the requisition forms. A lab technician poured the urine from the sample into two tubes. One tube remained in the FPRG

POL in Suite 350 for qualitative/presumptive testing. The second tube was delivered downstairs to Suite 230B to MTL for quantitative/definitive testing. On the very same day the urine sample was received, the FPRG POL ran the qualitative/presumptive test on one portion of the sample, and MTL ran the more comprehensive and expensive quantitative/definitive test on the second portion of the same sample. MTL ran the quantitative/definitive test **regardless of the results of the FPRG POL qualitative/presumptive testing**. There was no review of the qualitative/presumptive test results by a physician before MTL conducted the quantitative/definitive testing. Thus, even if a qualitative/presumptive test was negative, MTL performed the quantitative/definitive test. PPOA billed Medicare for both the qualitative/presumptive testing conducted by the FPRG POL and the quantitative/definitive testing conducted by MTL. On average, approximately 75-100 urine samples were processed and tested by FPRG and MTL per business day. Such tests were ordered and conducted without regard for medical necessity or the individual needs of the patient.

51. In January 2018, when Relator started working for PPOA, the TPRG POL and MTL had processing procedures for the UDTs from TPRG clinics. Urine samples for all of the TPRG clinics throughout Texas were first sent to the TPRG POL at the Virginia Parkway location. A TPRG lab technician poured the urine from the sample into two tubes. One tube remained in the TPRG POL for qualitative/presumptive testing. The second tube was sent via overnight mail by TPRG to MTL in Florida for quantitative/definitive testing. On the day the urine sample was received, the TPRG POL ran the qualitative/presumptive test on a portion of the sample. The following business day, when MTL received part of the TPRG sample, MTL ran the quantitative/definitive test on the same sample. MTL was not informed of TPRG's test results from the prior day. MTL ran the quantitative/definitive test **regardless of the results of**

**the TPRG POL qualitative/presumptive testing.** There was no review of the qualitative/presumptive test results by a physician before MTL conducted the quantitative/definitive testing. Thus, even if a qualitative/presumptive test was negative, MTL performed the quantitative testing. PPOA billed Medicare for the qualitative/presumptive testing conducted by the TPRG POL and for the quantitative/definitive testing conducted by MTL. On average, approximately 150-200 urine samples were processed and tested by TPRG and MTL ( for Texas patients) per business day. Such tests were ordered and conducted without regard for medical necessity or the individual needs of the patient.

52. Defendants' qualitative/presumptive testing was conducted using a chemical analysis observation called EIA (enzyme immunoanalysis), so it was billed at the highest level for qualitative/presumptive testing. Defendants' quantitative/definitive testing was run for the maximum number of tested drugs, so it was billed at the highest level for quantitative/definitive testing G0483, regardless of medical necessity.

53. Upon information and belief, the testing procedures described in paragraphs 49 to 52 were in place for approximately three years before Relator started working for PPOA in January 2018.

54. On or about May of 2018, Defendants determined that their UDT processing described in paragraphs 49 to 52 violated Medicare billing rules. On or about July 2018, Defendants directed the implementation of new UDT procedures in an attempt to comply with Medicare billing rules.

55. Defendants' UDT procedures in place until July 2018 did not allow the treating physician to make a patient-specific determination of medical necessity for the qualitative/presumptive test and/or the quantitative/definitive test. Rather, the UDTs were

conducted via blanket orders on the Defendants' lab requisition form that directed the lab to run both qualitative/presumptive and maximum quantitative/definitive testing on each patient without individualized determination of medical necessity. Because the UDTs were not conducted pursuant to a valid physician's order or a patient-specific determination of medical necessity by the treating physician, Defendants' practices violated Medicare billing regulations.

56. Further, Defendants automatically conducted the most complex and comprehensive quantitative/definitive UDTs possible without any consideration of the qualitative/presumptive test results because Defendants' requisition form automatically ordered both tests at the same time. If the treating physician had evaluated and ordered the qualitative/presumptive test results before ordering the quantitative/definitive test, the physician could have determined if the additional testing was needed or if a more limited quantitative/definitive test would have been sufficient.

57. Despite Defendants' specific knowledge as of May 2018 that their UDT procedures dating back to approximately 2015 violated Medicare billing rules, Defendants did not self-report their billing errors to CMS and/or return the amounts improperly billed to Medicare. They intentionally retained the ill-gotten funds.

58. PPOA manages the daily business operations of FPRG, TPRG, and MTL. PPOA employs all non-physician staff and handles all billing for FPRG, TPRG, and MTL. Upon information and belief, FPRG and TPRG employ the physicians who work at the various pain management clinics. PPOA directs and supervises the lab staff for FPRG, TPRG, and MTL. The FPRG and TPRG physicians do not directly supervise the lab staff processing the UDTs.

59. PPOA directs MTL to purchase and provide UDT supplies and services to the POL staff at FPRG and TPRG such as sample cups, specimen bags, cardboard boxes for

shipment, and pre-paid shipping labels. PPOA also directs MTL to schedule FPRG and TPRG lab shipment pick-ups and deliveries between labs. Also, PPOA directs MTL to provide most administrative services for FPRG and TPRG to ship samples to outside labs for private payors. FPRG and TPRG do not pay for MTL's provision of supplies or services. Thus, the MTL's supplies and administrative services are an intentional inducement to FPRG and TPRG to utilize MTL for lab processing.

60. PPOA directs the lab staff at FPRG, TPRG, and MTL to perform UDT processing at the FPRG/TPRG POLs and MTL unless a patient requests the use of another lab. The PPOA system is designed so the lab staff at FPRG, TPRG, and MTL process all Medicare beneficiary UDTs within the FPRG/TPRG POL and MTL system. Thus, PPOA improperly funnels lab referrals to the Defendants' labs.

61. Defendants' business structure prevents direct supervision or involvement of FPRG and TPRG physicians over the lab staff processing the UDTs as required by the Stark Law. Further, with the limited exception of FPRG physicians working at the Fletcher Avenue location, the MTL lab processing is not conducted at the same location as the FPRG and TPRG medical clinics. The one FPRG Fletcher Avenue clinic that is in the same building as the MTL lab is in a separate suite on a separate floor of the building. Thus, even the FPRG Fletcher Avenue physicians do not have direct access to MTL staff. The lab staff working at the FPRG and TPRG POLs and MTL are not directly supervised by the physicians who order the UDTs. Rather the FPRG and TPRG POL and MTL lab staff are supervised by PPOA administration.

62. The Defendants' business structure is designed to funnel the maximum number of UDTs for internal processing through the use of internal policies and procedures that direct staff to automatically route all Medicare UDT testing internally to the FPRG and TPRG POLs and

MTL. At least until July 2018, Defendants also employed a blanket order that required both qualitative and quantitative UDT testing at the maximum level without individualized consideration of medical necessity by the treating physician. Defendants further prevented supervision of lab staff by the treating physicians by keeping the lab staff, particularly MTL, separate from the treating physicians. Moreover, PPOA and not the treating physicians supervised the lab staff. Finally, the Defendants directed MTL to incur expenses for supplies and services and to manage most all administrative processing of the labs for FPRG and TPRG. In order to unlawfully induce the FPRG and TPRG physicians to send all lab work to MTL, MTL was not reimbursed the fair market value of their goods or services. Defendants' system, structure, policies, and procedures were designed to maximize the false billings to federal health care programs for UDT testing without regard for specific patient needs or medical necessity.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

63. Relator re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

64. In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented, or caused to be presented, materially false and fraudulent claims for payment or approval, and specifically billed federal health care programs for UDTs on Medicare patients that were not medically necessary or supported by a valid physician's order, and/or which were false because they resulted from illegal kickbacks and/or Stark Law violations.

65. As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

**COUNT TWO**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**

66. Re Relator re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

67. In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim and specifically billed federal health care programs for UDTs on Medicare patients that were not medically necessary or supported by a valid physician's order, and/or which were false because they resulted from illegal kickbacks and/or Stark Law violations.

68. As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(B), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

**COUNT THREE**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)**

69. Relator re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

70. In violation of 31 U.S.C. § 3729(a)(1)(C), Defendants knowingly entered into one or more conspiracies to present or cause to be presented false or fraudulent claims for payment and billed federal health care programs for UDTs on Medicare patients that were not medically necessary or supported by a valid physician's order, and/or which were false because they resulted from illegal kickbacks and/or Stark Law violations.

71. As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(C), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

**COUNT FOUR**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)**

72. Relator re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

73. In violation of 31 U.S.C. § 3729(a)(1)(G), Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government. Defendants knew their past, present, and future UDT billings were improper, and they improperly and intentionally retained overpayments despite such knowledge.

74. As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(G), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

**COUNT FIVE**
**PAYMENT BY MISTAKE**

75. Relator re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

76. The false claims that Defendants submitted to Plaintiff's agents were paid based upon mistaken or erroneous understandings of material facts including, but not limited to, the mistaken fact that Defendants had rendered valuable and medically necessary medical and UDT testing services as claimed in their billings with appropriate physician supervision and with a treating physician's prescription.

77. Plaintiff, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations in their billed claims, paid Defendants certain sums of money to which Defendants were not legally entitled.

78. Defendants must therefore account for and pay such amounts, as determined at trial, to Plaintiff.

**COUNT SIX**
**UNJUST ENRICHMENT**

79. Relator re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

80. By directly or indirectly obtaining federal funds to which Defendants were not legally entitled, Defendants received a benefit which would be unjust and inequitable for Defendants to retain.

81. Defendants have therefore been unjustly enriched and must account for and pay such amounts, or the proceeds therefrom, as determined at trial, to Plaintiff.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relator prays, on behalf of Plaintiff, that this Court:

1. For Plaintiff's Causes of Action under 31 U.S.C. § 3729, *et seq.*, enter judgment against Defendants for the amount of Plaintiff's damages, trebled pursuant to 31 U.S.C. § 3729(a), and civil penalties in the amount of $22,363 for each violation of the FCA;

2. For Plaintiff's Causes of Action for payment by mistake and unjust enrichment, enter judgment against Defendants in the amount of Plaintiff's damages and/or the amount by which Defendants were unjustly enriched or which Defendants retained illegally;

3. Require that Defendants provide an accounting of all revenues illegally obtained or retained by Defendants;

4. Award Relator the maximum amount permitted pursuant to 31 U.S.C. § 3730(d);

5. Award Relator all costs, including court costs, expert fees, investigative expenses, and reasonable attorneys' fees incurred by Relator in the prosecution of this suit;

6. Grant Relator and the United States leave to amend the Complaint based on any new evidence acquired throughout the discovery process, including but not limited to evidence that Defendants submitted the same or similar fraudulent claims to Medicaid, Tricare, or other federal healthcare programs; and

7. Grant Relator and the United States such other and further relief that the Court deems appropriate and proper.

Respectfully submitted,

**WELDON & ROTHMAN, PL**

By:____________________________
Bradley P. Rothman, Florida Bar No. 0677345
2548 Northbrooke Plaza Drive
Naples, Florida 34119
Telephone: (239) 262-2141
Facsimile: (239) 262-2342
Email: brothman@weldonrothman.com

**-and-**

**MILLER & MARTIN PLLC**

Richard C. Rose, Tennessee Bar No. 017544
Leah M. Gerbitz, Tennessee Bar No. 016698
Lynzi J. Archibald, Tennessee Bar No. 030063
832 Georgia Avenue, Suite 1200
Chattanooga, Tennessee 37402-2289
Telephone: (423) 756-6600
Facsimile: (423) 785-8480
Email: Richard.Rose@millermartin.com
Email: Leah.Gerbitz@millermartin.com
Email: Lynzi.Archibald@millermartin.com

***Counsel for Plaintiff-Relator***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and exact copy of the foregoing was served via certified U.S. mail in a properly addressed envelope, postage prepaid, to assure delivery to:

Honorable William Barr
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Maria Chapa Lopez, Esq.
U. S. Attorney, Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, Florida 33602

Randy Harwell, Esq.
Assistant U.S. Attorney, Chief, Civil Division
U.S. Attorney's Office, Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, Florida 33602

This 6 day of March, 2020.

**WELDON & ROTHMAN, PL**

By: ______________________
Bradley P. Rothman